UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

MARTIN CORNELL MCCLAIN, Inmate
Identification No. 419-803,

    Plaintiff,

    v.

WARDEN GRAHAM, et al.,

    Defendants.

Civil Action No. GLR-17-2391

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Motions to Dismiss or, in the Alternative, for Summary Judgment filed by Medical Defendants Joubert, Pierce, Barrera, Mahler and Prior (ECF No. 33) and Correctional Defendants Graham, Weber and Baucom (ECF No. 39), to which Plaintiff Martin McClain has filed opposition responses (ECF Nos. 41, 48). Additionally, McClain has filed a Motion requesting summary judgment and preliminary injunctive relief (ECF No. 47). The Court, having reviewed the Motions and supporting documents, finds no hearing necessary. See Local Rule 105.6. (D.Md. 2016). For the reasons outlined below, the Court will grant the Motions filed by the Medical and Correctional Defendants, and deny the Motion filed by McClain.

**I.    BACKGROUND**

In a Complaint filed on August 18, 2017, Plaintiff Martin Cornell McClain stated that prison health care providers are deliberately indifferent to his medical needs because they have not provided an egg crate medical mattress, a right hand brace, a right knee

brace, new wheelchair seat and back cushions, a cell with handicap rails, and pain medications. McClain, whose Complaint was construed as a civil rights action under 42 U.S.C. § 1983, requests money damages and injunctive relief by which he is provided the medication and supplies sought. (Compl. at 5, 8–9, ECF No. 1).[1]

McClain states these supplies are needed to address his medical issues, including chronic nerve damage, arthritis, and problems caused by being wheelchair-bound. (Id. at 5). He asserts the items he now requests were provided to him while he was housed at Jessup Correctional Institution ("JCI"), and most of these items were taken from him when he was transferred to Western Correctional Institution ("WCI") on January 18, 2017, "by the above named defendants." (Id. at 6).[2] He states he was provided a wheelchair and cane, but was not given a handicapped cell or a medical mattress needed to provide sufficient spine support. (Id.).

McClain further claims he was unable to lift himself out of a non-medical bed and was therefore forced to sit in his wheelchair to sleep for a period of 45 days, (id.), and that his pain management regimen was discontinued without explanation on June 10, 2017. (Id. at 7). He asserts the assistant warden approved the issuance of his medical supplies on August 4, 2017, but the approval was ignored. (Id.). McClain states that

---

[1] Citations to the record refer to the CM/ECF pagination.
[2] McClain states that he has not been provided medical records predating his transfer from JCI to WCI. ECF 41, p. 2, ¶ 10. Medical records relevant to the instant Complaint allegations were provided to McClain as attachments to Defendants' dispositive motions. The need for prior records is not apparent, given that the Court accepts McClain's assertion that his medical property as well as his medication regimen changed at the time of his transfer.

Department of Public Safety and Correctional Services ("DPSCS") directives mandate that upon transfer all ordered medical treatments are to follow the prisoner. (Id. at 7–8).

McClain is a fifty-year-old prisoner with a significant medical history of Hepatitis C, morbid obesity, hypertension, chronic pain syndrome, and asthma. (Joubert Affidavit ¶ 3, ECF No. 33-5). He was transferred to WCI on January 24, 2017, and was seen by Nurse Practitioner Beverly McLaughlin on February 20, 2017, at the chronic care clinic. (ECF No. 33-4 at 3–6). His hepatitis was stable. McClain a history of spinal stenosis since 1994, a history of right knee displacement, and several gunshot wounds ("GSW") (shot a total of 18 times on two occasions). He was wheelchair dependent due to frequent falls. (Id.). McClain reported that his left hip and back "go out," and that he urinated frequently due to bladder reconstruction following a gunshot wound. (ld.). He also reported problems getting to the commode on time. McClain's blood pressure was elevated and his lower limbs were swollen. (Id.). He was prescribed Hydrochlorothiazide and his Neurontin prescription was adjusted to 800 mg twice daily, because WCI provided pill call only twice a day.

He requested an egg crate mattress and bed rails, and was told the medical provider would speak with a medical team to see what was available. (Id.). Nurse Practitioner McLaughlin noted on February 23, 2017 that egg crate mattresses were deemed a fire hazard and not permitted, and that a gel overlay mattress would instead be ordered. (Id. at 7–9). McClain received the mattress on March 21, 2017. (Id. at 10).

On March 27, 2017, McClain told a nurse at sick call that his gel cushion on his wheelchair had broken and had been taken by corrections personnel. (ECF 33-4 at 11–

3

12). The complaint was referred to a provider. (Id.). On April 3, 2017, McClain was seen at sick call because housing unit personnel reported he was unable to move. (Id. at 13–14). Dr. Barrera ordered an injection for Toradol and McClain returned to his housing unit. (Id.). Two days later, on April 5, 2017, McClain reported to Nurse Practitioner Mahler he felt increasing low back pain radiating down his buttocks and legs to his knees, starting in January 2017. (Id. at 15–18). He told Mahler he had been on Elavil, but was found unconscious while taking it in April 2014. (Id.). McClain stated he had tried physical therapy multiple times, but it did not help. (Id.). He denied fever, dysuria, blood in his urine, bowel or bladder incontinence, a history of back surgery, or recent injury, and indicated he had multiple gunshot wounds requiring bladder reconstruction, a history of spinal stenosis, and a right knee replacement. (Id.). A previous thoracic x-ray taken in September 2016 showed no acute osseous abnormality, but noted metallic bullet fragments along the pelvic bone. (Id.). A lumbar x-ray taken July 2016 showed mild degenerative disc disease but no acute osseous abnormality. (Id.). McClain was on Neurontin and Baclofen, which he claimed were ineffective in stopping his pain. (Id.). He stated he used Percocet and Oxycodone when he was on the street and wanted them again. (Id.). McClain used a wheelchair for distance, could only walk a few feet, and was morbidly obese. He was advised to lose weight, do back stretching exercises, do no heavy lifting, continue Neurontin and Baclofen, and start Tramadol, 650 mg twice daily for 60 days. (Id. at 75, 77). Examination revealed no spasm, pain during straight leg raises at 30 degrees, and mild tenderness to palpation of the thoracic and lumbar spine. (Id.).

4

On April 22, 2017, McClain complained at sick call of a cold, and requested wrist braces and a wheelchair seat cushion. He was referred to a provider for evaluation of the wrist brace and wheelchair cushion requests. (Id. at 9–20).

On May 16, 2017, McClain was seen at sick cell by Nurse Practitioner Janette Clark due to his ongoing cough. Clark prescribed Zantac for 30 days to see if the cough was caused by esophageal reflux, and a chest x-ray was ordered. (Id. at 21–22). The request to replace McClain's leaking wheelchair pad was sent to the Director of Nurses, and McClain was told to follow up with a provider in two weeks. (Id.). The x-ray results showed no acute cardiopulmonary disease. (Id. at 23).

On June 11, 2017, Nurse Practitioner Pierce saw McClain. X-rays of the hip and spine showed no osseous abnormality, showed bullet fragments along the pelvic bone, and revealed that vertebral body heights and disc spaces were preserved. (Id. at 22, 24–28). McClain was taking Neurontin and Baclofen, and requested an increase of Tramadol, a replacement seat cushion, and wrist braces, because pushing his wheelchair caused wrist pain. (Id.). A consult for physical therapy to strengthen McClain's gait was placed, and he was prescribed Cymbalta 30 mg for 7 days, increasing to 60 mg daily, while tapering McClain off Neurontin and Baclofen. (Id.). The wheelchair cushion and wrist braces were delayed pending evaluation by the physical therapist. (Id.).

On July 2, 2017, McClain complained at sick call of dizziness, lightheadedness and headache. (Id. at 29–31). He admitted to not taking his blood pressure medication for ten days, and was given Norvasc, a blood pressure medication, on verbal orders of

5

Physician's Assistant Terri Davis. His blood pressure medication was renewed and Amlodipine (Norvasc) was prescribed. (Id.).

One day later, on July 3, 2017, McClain was seen by Physician's Assistant Terri Pryor for complaints of knee, back, and hip pain that were "ten out of ten." (Id. at 33–34). He stated he needed Tramadol and Neurontin as they are the only medications that work, and was told they would not be prescribed because they were not appropriate for him. (Id.).

On July 5, 2017, McClain complained his medications were changed during his wheelchair assessment. (Id.). On July 10, 2017, he was seen by Nurse Practitioner Mahler, complaining of radiating low back pain and that Cymbalta did not work. McClain indicated he wanted Neurotin and Baclofen, and was told the medications would not be renewed and that Cymbalta was more appropriate for his pain. Mahler's offer to increase the Cymbalta was declined. The consult for physical therapy was scheduled for presentation at collegial review that week, and McClain was advised to lose weight, avoid heavy listing, and do back exercises. His concerns about the use of Tylenol were addressed. (Id. at 36–38).

On July 27, 2017, McClain told a physical therapist he had not walked in two years. He was able to transfer from his wheelchair to his mattress independently. McClain was assessed as having declining mobility and being morbidly obese, and therapeutic exercises and activity were planned. No recommendation for a seat cushion or wrist braces was made. (Id. at 39).

The next day, July 28, 2017, Nurse Practitioner McLaughlin saw McClain at the chronic care clinic, where he complained that Cymbalta did not work, physical therapy increased his pain, he had increasing incidents of falling and injuring his right knee, and he had less mobility due to pain. Cymbalta was discontinued and he was prescribed Neurontin 800 mg twice a day, and Robaxin 500 mg one tab twice daily. (Id. at 40–44). McClain had a dorsal hump in his right hand, finger weakness, and a weak grip. A right knee brace and right wrist brace were ordered. (Id.).

On August 15, 2017, medical personnel were called to the housing unit where McClain was found unresponsive, possibly due to an overdose. Narcan was administered. An ambulance was called; however, Dr. Joubert determined McClain could be kept at the prison infirmary for observation, and hospital assessment was not required. (Id. at 45–48). Thirteen tablets of Robaxin were found in McClain's cell; his Robaxin and Neurontin prescriptions were discontinued. (Id. at 79). His recovery was unremarkable, and he was discharged back to general population on August 17, 2017. (Id. at 53, 58).

During an August 31, 2018 physical therapy session, McClain indicated he was making slow progress on the right knee, but had torn his right patella tendon two months or more ago. (Id. at 59). He still wore an immobilizer. He was able to stand and walk with an unsteady gait without a crutch, but stated he used a crutch in his cell. McClain was able to perform straight leg raising with minimal knee dropping, but there was

7

swelling on the outside of the right knee. The therapy plan included heat packs, static stretching and strengthening exercises and gait training with a cane. (Id.).

On September 19, 2017, McClain complained to Nurse Practitioner Mahler that he had not been issued his pain medication. He was told Neurontin and Robaxin had been discontinued after his possible overdose. McClain denied medication abuse. He refused Tylenol, stated he would file an ARP and see his lawyer, and left. (Id. at 60–61).

On October 4, 2017, McClain complained at nurse sick call that his pain medication had been stopped and his cane removed. He was told his medications were discontinued after his overdose and his cane was removed because he already had a wheelchair. (Id. at 62–63).

On October 9, 2017, McClain told Nurse Practitioner McLaughlin he declined physical therapy as it caused him pain, and that he had not overdosed, but simply passed out, which had happened before. He indicated the egg crate mattress was not considered a safety hazard at other institutions. He declined an order for Cymbalta, and left without an exam. (Id. at 64–65).

On November 3, 2017, McClain stated he fell getting out of bed three days earlier, injuring his back and right hand. He had poor grip but no hand swelling or discoloration. He reported intense pain, but could move and reposition the hand without signs of discomfort. There was no bruising or swelling to the right side of the back or hips. He stated he was allergic to Tylenol and Ibuprofen. (Id. 66–67).

On November 13, 2017, Nurse Practitioner McLaughlin examined McClain's hand and ordered an x-ray. McClain indicated he had not yet received the right hand brace ordered in August. (Id. at 68–69). The x-ray showed no sign of fracture, dislocation or subluxation. (Id. at 70).

At his December 8, 2017 annual medical exam, McClain sought a refill of his pain medications. Plaintiff was seen by PA Davis for his annual physical. Plaintiff wanted a refill of his pain medications, which were not indicated and/or could not be given due to his self-reported history of blackouts. He was offered Tylenol and Ibuprofen, and agreed to try low doses of Tylenol and stop if it caused blood in his urine. (Id. at 71–73). McClain complained of left shoulder pain that began after a blackout, and stated he could not lift his left arm. He was wearing a pullover sweatshirt and could raise his arm to remove it. He was told to control the pain through stretching until the cause of the blackouts was determined. An EKG was ordered. A finger stick reading for diabetes was high, so a blood workup was ordered. (Id.). A shoulder x-ray showed no evidence of fracture, dislocation or subluxation. (Id. at 74).

The Medical Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 33), as did the Correctional Defendants (ECF No. 39). McClain filed Oppositions respectively, (ECF Nos. 41, 48), and each set of Defendants filed a respective Reply, (ECF Nos. 50, 51).

Additionally, McClain has filed a Motion requesting summary judgment and preliminary injunctive relief (ECF No. 47), opposed by the Medical Defendants (ECF No. 52), to which McClain has replied. (ECF Nos. 53, 54, 65,[3] and 66[4]).

## II. DISCUSSION

### A. Standard of Review

The Defendants' Motions are styled as motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D. Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed. R.Civ. P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey

---

[3] On June 26, 2018, McClain requested this Court order WCI personnel return records and files, some relating to this case, which he alleges were seized on April 15, 2018. (ECF No. 63). McClain does not state the seizure of the records and files had impact on his ability to file opposition responses or other motions in this case, and the docket supports this conclusion. Injunctive relief will be denied here. Because McClain filed administrative grievances concerning this seizure, he may wish to formally challenge the action by seeking civil rights relief in this Court.

[4] McClain's "Motion to Request Court Entery [sic] to Show Cause of Medical Neglect/Retaliation and Harassment" (ECF No. 66) essentially explains why he is "self-medicating." It is more properly read as an opposition response to the Medical Defendants' dispositive motion. While it will be denied as an injunctive relief request, it shall be considered as an opposition response.

v.Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

Here, McClain was on notice that the Court might resolve Defendants' Motions under Rule 56 because Defendants styled their Motions in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). In addition, the Clerk informed McClain about the Motions and invited his opposition thereto, and McClain filed Oppositions and several other filings that included extra-pleading materials in support of his claims. Accordingly, because the Court will consider documents outside of McClain's Complaint in resolving Defendants' Motions, the Court will treat the Motions as motions for summary judgment.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would

be admissible in evidence," Fed. R. Civ. P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**B.     Analysis**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain," Gregg v. Georgia, 428 U.S. 153, 173 (1976). Scrutiny under the Eighth Amendment "is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F. 3d 630, 633 (4th Cir. 2003). In the context of delay or denial of medical care, an Eighth Amendment violation arises when the actions of a defendant, or the failure to act, amount to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 105–06 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994).

The subjective component requires "subjective recklessness" in the face of the serious medical condition. Farmer, 511 U.S. at 839–40. True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk. Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter thus becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Virginia Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).

## C. Liability of the Medical Defendants

There is no dispute that the Medical Defendants have responded to McClain's health problems, providing medications, testing, physical therapy, assistive devices, and advise on weight loss, though the parties disagree over some of the Medical Defendants' diagnoses, conclusions, follow-up actions, and other decisions, as well as over the effectiveness of some of their treatments and the severity of some of McClain's symptoms. Even when viewed in a light most favorable to McClain, however, while he may have experienced delays in obtaining replacement of gel mattresses, wheelchair cushions, and braces, and was denied a specific type of mattress permitted in other prisons, such delays does not amount to a constitutional violation.

To the extent McClain argues his pain medication is ineffective, evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference. Baez v. Falor, 2012 U.S. Dist. LEXIS 138574, 103,2012 WL 4356768 (W.D.Pa. 2012) (citing Thomas v. Coble, 55 F. App'x 748, 749 (6th Cir. 2003); Rochell v. CMS, No. 4:05CV268, 2006 U.S. Dist. LEXIS 37943, at 10 (N.D. Miss. April 10, 2006) ("The constitution does not . . . guarantee pain-free medical treatment . . . While the plaintiff might have preferred stronger medication, his mere disagreement with his medical treatment does not state a constitutional claim."). The evidence here demonstrates that the Medical Defendants provided pain medication, but that they later decided the medication was unsuitable due to McClain's self-reported

claims of blackouts and loss of consciousness.[5] Such evidence is insufficient to withstand summary judgment under the Eighth Amendment. Accordingly, the Court will grant the Medical Defendants' Motion.

D. **Liability of the Correctional Defendants**

The Correctional Defendants, Warden Graham, Assistant Warden Weber, and Director of Clinical Services Baucom argue as an affirmative defense that McClain's allegations are insufficient to state a claim based on supervisory liability, and that they cannot incur liability under 42 U.S.C. § 1983 based on the doctrine of respondeat superior.[6] These Defendants declare they have no personal involvement in providing medical care to any WCI prisoner, and that medical services are provided by a private medical contractor. (Graham Decl. ¶ 3, ECF No. 39-1; Weber Decl. ¶ 3, ECF No. 39-3; Baucom Decl. ¶ 3, ECF No. 39-4). Baucom further avers that she is an administrator who does not practice medicine or provide direct medical care to prisoners, and that she does not have supervisory authority over the private medical contractors' staff. (Baucom Decl. ¶¶ 1, 4). Baucom does not personally review any Administrative Remedy Procedure ("ARP") complaints by prisoners concerning private medical contractors, unless there is a question raised by a masters level nurse from the Office of Inmate Health Services, a DPSCS employee, requiring clinical input. (Id. ¶ 6).

---

[5] In addition, McClain's belief that pain medication is withheld to punish him is not supported by the record.
[6] Defendants further assert they are entitled to qualified immunity. As the constitutional requirement to provide medical care has long been recognized, the Court cannot dismiss this lawsuit based on qualified immunity.

The law in the Fourth Circuit is well established that the doctrine of <u>respondeat superior</u> does not apply in § 1983 claims. See <u>Love-Lane v. Martin</u>, 355 F.3d 766, 782 (4th Cir. 2004) (no <u>respondeat superior</u> liability under § 1983). Liability of supervisory officials Ais not based on ordinary principles of <u>respondeat superior</u>, but rather is premised on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." <u>Baynard v. Malone</u>, 268 F. 3d 228, 235 (4th Cir. 2001) (citing <u>Slakan v. Porter</u>, 737 F. 2d 368, 372 (4th Cir. 1984)).

Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. See <u>Shaw v. Stroud</u>, 13 F. 3d 791, 799 (4th Cir. 1994). Because the Court concluded that McClain cannot demonstrate constitutional injury, Graham, Weber and Baucom are entitled to assert this defense.

## III. CONCLUSION

For the foregoing reasons, the Court will grant the Motions to Dismiss or for Summary Judgment filed by the Medical Defendants and the Correctional Defendants (ECF Nos. 33, 39); deny McClain's Motion for Summary Judgment (ECF No. 47); and deny McClain's injunctive relief requests (ECF Nos. 63 and 66). A separate Order follows.

Entered this 21st day of August, 2018.

/s/
George L. Russell, III
United States District Judge